In re Eldon **TALLANT**, Debtor.

**Bankruptcy No. 86–01302.**

United States Bankruptcy Court,
M.D. Alabama, N.D.

April 2, 1987.

Lloyd V. Crawford, Rushton, Stakely, Johnston, & Garrett, Montgomery, Ala., for debtor.

Joseph P. Borg, Capouano, Wampold, Prestwood, & Sansone, P.A., Montgomery, Ala., for First Alabama Bank.

## OPINION ON MOTION FOR VALUATION OF SECURITY

A. POPE GORDON, Bankruptcy Judge.

The debtor, Eldon T. Tallant, filed a motion requesting the court to determine whether the dragnet clause in a hypothecation agreement between the debtor and his father, Elmer A. Tallant, as borrowers, and the creditor, First Alabama Bank, operates to continue the property hypothecated as security for a loan made later to the debtor alone.

The matter was submitted upon the pleadings and briefs of counsel for the parties.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K), and (O). These findings of fact and conclusions of law are made pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

The facts before the court are not disputed. The debtor and his father are joint payees of a real estate mortgage note from Montgomery Growth Properties, Ltd. The Montgomery note was assigned by the debtor and his father to the bank pursuant to a hypothecation agreement dated October 11, 1976. The hypothecation agreement was executed by the debtor and his father, and was given to secure an indebtedness evidenced by a note of even date to the bank. That 1976 note secured by the hypothecation agreement was also executed by the debtor and his father, and remains unsatisfied.

Some seven years later, in 1983, the debtor became indebted to the bank and executed two notes to the bank evidencing the debt. The notes were executed solely by the debtor doing business as "Tallant Farms."

The balance due on the 1976 note is much smaller than the balance due on the 1983 notes. Once the 1976 note is paid off, the Montgomery note will no longer be encumbered unless the language of the future advance provisions in the hypothecation agreement means that the Montgomery note will continue as security for the debtor's 1983 notes.

For the purpose of consummating the confirmed Chapter 11 plan, it is necessary to determine the extent of the bank's interest in the Montgomery note, as required by 11 U.S.C. § 506(a). That requires determining whether the Montgomery note is security for payment of the 1983 notes.

The future advance (dragnet) provisions of the hypothecation agreement consist of the consideration clause and the defeasance clause:

*Consideration clause*
Witnesseth:

That the party of the first part ["Eldon T. Tallant, Elmer A. Tallant"] has this day borrowed from the party of the second part the sum of Two Hundred Forty-three Thousand and no/100 Dollars which is evidenced by note of party of the first part, dated October 11, 1976....

And, whereas, the party of the first part is desirous of securing the prompt payment of said note when the same falls due, as well as any other debt which the party of the first part may now, or hereafter owe to the party of the second part, as principal, surety, endorser, or otherwise, before this pledge is surrendered and cancelled.

Now, Therefore, in consideration of the premises and for the purpose of securing the payment of the note above described, as well as any other indebtedness now or hereafter due or owing to the party of the second part, the party of the first part does hereby grant, bargain, sell....

*Defeasance clause*

If the party of the first part shall pay the note secured hereby when the same becomes due, and any other debt whether as principal, surety, endorser, or otherwise, which the party of the first part may then owe the party of the second part or which may be incurred by the party of the first part with the party of the second part before the surrender or cancellation of this agreement, then this agreement shall be void.

The bank contends and the debtor denies that these clauses show an intent to continue the Montgomery note as security for the debtor's 1983 notes after completion of payment of the 1976 note. Therefore, it is necessary to construe the meaning of these clauses.

■ This language leaves no doubt that future advances of money made to *both* the debtor and his father prior to payment of the 1976 note would be secured by the Montgomery note. The language found in those clauses is typical of language generally held to create valid future advance clauses. See *First National Bank v. Bain*, 237 Ala. 580, 188 So. 64 (1939); and *City National Bank of Dothan v. First*

*National Bank of Dothan*, 285 Ala. 340, 232 So.2d 342 (1970). Although those cases, as well as some of the other cases relied on by the bank and the debtor, are grounded on construction of mortgage clauses, there seems to be no good reason why those cases should not also be applicable to hypothecation agreements. A widely accepted general rule of construction is that a mortgage and the note secured by the mortgage should be construed together as parts of one transaction. That rule will be applied to the hypothecation agreement and its notes, just as with a mortgage and a mortgage note. Also, it is elementary that contract law applies in the construction and interpretation of hypothecation agreements *qua* contracts, as well as mortgages. See 55 Am.Jur.2d *Mortgages* § 175 and § 176 (1964).

At the heart of the issue over the operation of the future advance clause, as presented by the parties, is the interpretation of the term "party of the first part" as used in the hypothecation agreement. The parties urge the court to do what amounts to assigning an artificial meaning to the term "party of the first part," which is used ungrammatically in the hypothecation agreement to stand for "Eldon T. Tallant, [sic] Elmer A. Tallant." (emphasis added) At issue, they say, is whether that term includes *only* the debtor and the father jointly or whether it includes either one without necessarily including both.

The debtor argues—no doubt inspired by the cases of *Cordele Banking Company v. Powers*, 217 Ga. 616, 124 S.E.2d 275 (1962) and *Hill v. Perkins*, 218 Ga. 354, 127 S.E.2d 909 (1962)—that "party of the first part" designates the debtor and his father in the singular and, therefore, the individual debt of the debtor is not a debt of the "party of first part." Ergo, the 1983 notes signed by the debtor alone are not secured by the hypothecated property.

On the other hand, the bank cites several Alabama cases apparently holding that when "party of the first part" is used, as the word "mortgagor" was used, ungrammatically to denominate more than one entity, the term should be read to mean *ei-*

*ther party* or both. Therefore, the bank says, a future advance made to one of the parties *only* is secured by the hypothecated property, relying on, among other cases, *Luverne Land Company v. Bank of Luverne*, 200 Ala. 85, 75 So. 461 (1917); *First National Bank v. Bain*, 237 Ala. 580, 188 So. 64 (1939); *Martin v. First National Bank of Opelika*, 279 Ala. 303, 184 So.2d 815 (1966); and *Crescent Credit Corporation v. Union Bank & Trust Company*, 51 Ala.App. 683, 288 So.2d 744 (1974).

Even Alabama cases do not always reach the same result in construing the meaning of the singular terms "mortgagor" or "party of the first part" when those terms are used to denote multiple parties. Compare for instance *Luverne Land Company v. Bank of Luverne*, 200 Ala. 85, 75 So. 461 (1917), in which the term "mortgagor" included future advances made to one of the mortgagors, with *Monroe County Bank v. Qualls*, 220 Ala. 499, 125 So. 615 (1929), in which the term "party of the first part" did not include a note for a future advance executed by the mortgagor and others.

■ The court will not be drawn into semantical arguments over the meaning of "party of the first part," which exploit connotation and ambiguity at the expense of substance.[1] Rather, an attempt will be made to determine the intent of the parties "as expressed by the terms of the instrument and any admissible collateral facts." *Crescent Credit Corporation*, supra, at 686, 288 So.2d 744.

■ Since the express terms of the hypothecation agreement, the 1976 note, and the 1983 notes shed no light on the status of the Montgomery note when a future advance is made to only one of the borrowers, the collateral facts must be examined to seek an intent common to all the parties.

■ To arrive at such an intent, it is necessary to apply the general rule of reasonable, fair and practical construction. Contracts must receive a reasonable construction according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. Reasonableness, therefore, is a watchword in the construction of contracts. A reasonable construction will be preferred to one which is unreasonable, and that interpretation should be adopted which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties. The language employed by parties to a contract should receive a fair, reasonable, and practical construction, since it is to be presumed that the parties contracted with reference to fair, reasonable, and practical results. 17 Am.Jur.2d *Contracts* § 252 (1964).

■ In applying the rule of reasonable, fair and practical construction, it is necessary to resort to some conjecture[2] at this point by turning the clock back to 1976, at the time the hypothecation agreement was signed and no future advances had been made. At that time, it appears that the debtor and his father were two individuals who had decided to borrow money from the bank together, presumably to use for a

---

**1.** Included in such arguments are the contentions argued in briefs that some meaning should be attached to the omission of "and" or "or" in describing the borrowers as "Eldon T. Tallant, Elmer A. Tallant"; and that the use of the word "debtor" in the 1976 note to include "the singular and plural ... whenever the context so requires," discloses an intention of the parties other than an attempt to render the use of the word "debtor" in the printed note form grammatical for all uses of the form.

Although the grammatical construction of a contract is often a reliable signpost in the search for the intention of the parties, at times the language of a contract, read as a whole and in the light of the circumstances surrounding its execution, may disclose an intention which

would be thwarted by a strict grammatical construction; in such case the court is not bound to follow the signpost of grammatical construction, particularly when it appears to point in the wrong direction. Intention may be formulated in terms that are not grammatical. 17 Am. Jur.2d *Contracts* § 278 (1964). As will be discussed, the intention of the debtor and the bank would likely be thwarted by strict grammatical construction in this case.

In a contract which contains punctuation marks, the words, and not the punctuation, are the controlling guide in its interpretation. 17 Am.Jur.2d *Contracts* § 279 (1964).

**2.** Conjecture is appropriate in a case such as this. See 17 Am.Jur.2d *Contracts* § 241 (1964).

common purpose. But the purpose is not revealed by facts before the court. It appears only that they acted as separate individuals, not as fiduciaries, partners, joint venturers, or in any other capacity which might warrant treating them as a single entity in this case.

At that time, they each owned an undivided one-half interest in the Montgomery note. They executed the 1976 note and the hypothecation agreement and pledged each of their interests as security for the 1976 loan. As already seen from the consideration and defeasance clauses, they contemplated future advances.

Some seven years later (1983) one of them (the debtor) borrowed money from the bank again, apparently for use in his farming operation.[3] Again, no language in the 1983 notes shows an agency or any other connection in 1976 (or in 1983) between the debtor and his father. Nothing in the 1983 notes indicates whether the 1983 loans to the debtor were made with or without knowledge or consent of the father.

From the standpoint of the borrowers, in the absence of an express provision in the agreement or facts to show otherwise, it is not reasonable to conclude that the parties intended that, acting unilaterally, one borrower could obtain a future advance, default on repayment, and thereby jeopardize the undivided one-half interest of the other in the Montgomery note. Otherwise, the borrowers would be unjustly placed in litigious, opposing positions when, without consent, one lost his interest in the Montgomery note through foreclosure.

On the other hand, under the facts of this case, it is not reasonable to conclude that *either* one of the borrowers intended or expected that *his* interest in the Montgomery note would be released as security after repayment of the 1976 note, but before repayment of any future advance made to him individually. To conclude otherwise would lead to an unjust result: leaving the bank without any security for the future advance—clearly a result not intended by the bank.

From the standpoint of the bank, in the absence of an express provision in the agreement or facts to the contrary, it is not reasonable to conclude that the bank intended to hold the entire Montgomery note as security for a future advance to one borrower without the consent of the other borrower. Again, to conclude otherwise would be unjust and place the bank, in case of default by one borrower on a future advance to him individually, in a litigious position against a nonconsenting borrower whose interest in the Montgomery note was lost by foreclosure.

As already seen, the dragnet clause does not expressly provide for a situation in which a future advance is made to one borrower only. However, after excluding unreasonable conclusions, a thread of intent common to the bank and the borrowers emerges. A reasonable, fair and practical construction of the language of the future advance clause consistent with that common intent becomes evident and the court concludes that neither the debtor nor the bank intended for the debtor's interest in the Montgomery note to be released as security after repayment of the 1976 note, but before repayment of the 1983 notes of the debtor. The court concludes further that none of the parties reasonably intended or expected that the father's interest in the Montgomery note remain, after payment of the 1976 note, as security for the future advance to the debtor without the father's consent. No facts before the court show such consent.

 A construction which is just and fair to both parties will be preferred to one which is unjust or unfair, and a contract will not be construed so as to render it oppressive or inequitable as to either party, or so as to place one of the parties at the mercy of the other, unless it is clear that such was their intention at the time the contract was made. 17 Am.Jur 2d *Contracts* § 252 (1964).

Consistent with these conclusions, the court holds that the debtor's 1983 notes are secured only by the hypothecated, undivid-

---

3. The 1983 notes recite that the debtor was doing business as "Tallant Farms."

ed one-half interest of the debtor in the Montgomery note.

An order will enter accordingly.

